E-FILED
Wednesday, 03 July, 2013  08:46:58 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

MARY BETH SCARAVILLI,          )
                               )
    Plaintiff,             )
                               )
       v.               )          Case No.   12-cv-1160
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security,          )
                               )
    Defendant.             )

# O R D E R   &   O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance (Doc. 15). Plaintiff seeks judicial review of a decision of the Commissioner of Social Security denying disability benefits to Plaintiff. (Doc. 1 at 1).  For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Affirmance is GRANTED.

## PROCEDURAL HISTORY

Plaintiff filed for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act on August 20, 2007. (R. at 154-164). Plaintiff claims she has been disabled with lower back problems since December 18, 2004. (R. at 154, 157, 202).  Plaintiff's claim for disability benefits was initially denied on November 20, 2007. (R. at 94). Plaintiff then filed a request for reconsideration on January 31, 2008, (R. at 103), and was denied on May 22, 2008. (R. at 106, 111). On June 16, 2008, Plaintiff filed a request for a hearing before an

Administrative Law Judge ("ALJ"), which took place on March 29, 2010. (R. at 116, 64-93). In a written decision issued on April 15, 2010, Shreese M. Wilson, the presiding ALJ, determined that Plaintiff had a severe back impairment, but was not disabled under the Act. (R. at 45-58). Plaintiff filed a request for appeal, but the Appeals Council denied Plaintiff's request on August 5, 2011, thus making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 39, 28). Plaintiff then filed the present action on May 21, 2012, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1). Plaintiff further filed a Motion for Summary Judgment in the instant case (Doc. 11), and a Memorandum in support of the Motion (Doc. 12). Defendant filed a Motion for Summary Affirmance (Doc. 15), and a Memorandum in support of that Motion (Doc. 16).

LEGAL STANDARDS

## I. Disability Standard

To qualify for disability benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(a). The impairment must either "be expected to result in death," or must have lasted or "be expected to last for a continuous period of not less than 12 months." *Id*. The Commissioner must consider the evidence in a claimant's case record and make factual determinations to establish whether the claimant is entitled to any benefits. *See* 42 U.S.C. § 405(b)(1).

The Commissioner applies a five-step sequential analysis to determine whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 404.1520;[1] *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant bears the burden of proving the existence of her disability through the first four steps of the analysis by demonstrating she has "an impairment of sufficient severity" to preclude her from engaging in past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). The claimant must provide objective medical evidence of "the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). A claimant's statements as to pain or other symptoms alone will not be conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A). If a claimant meets her burden, the burden then shifts to the Commissioner to prove that the claimant is able to perform "some other kind of substantial gainful employment." *McNeil*, 614 F.2d at 145 (internal quotation marks omitted).

The five-step analysis more specifically breaks down in the following sequence:

1) The Commissioner determines whether the claimant is currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant

---

[1] Because Plaintiff applied for benefits under both title II and title XVI of the Social Security Act, (R. at 154-164), two different parts of the Code of Federal Regulations apply. However, the relevant regulations are virtually identical. Therefore, the Court will cite only to the regulations for title II (20 C.F.R. §§ 404.1500-.1599), omitting the citation to the regulations for title XVI (20 C.F.R. §§ 416.900-.999d) unless there is a notable difference.

engages in substantial gainful activity, she is not disabled. *Id*. If she does not, the Commissioner proceeds to step two. 20 C.F.R. § 404.1520(a)(4).

2) The Commissioner determines whether the claimant has a severe medically determinable physical or mental impairment that meets the durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that significantly inhibits the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the claimant's impairments or combination of impairments is not severe, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the impairment or combination of impairments is severe, the Commissioner proceeds to the next step.

3) The Commissioner determines whether the claimant's impairment meets or medically equals the criteria of a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment meets or medically equals a listed impairment, the claimant is disabled. 20 C.F.R. § 404.1520(d). If not, the Commissioner moves to step four.

4) The Commissioner reviews the evidence to consider the claimant's residual functional capacity ("RFC") and her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is still able to meet the physical and mental demands of her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1520(f).

5) At the final step, the Commissioner determines whether the claimant can adjust to other work by considering the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant cannot adjust to other work, she is disabled. 20 C.F.R. § 404.1520(g). Otherwise, she is not. *Id*.

## II. Standard of Review

When a claimant seeks judicial review of the ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

To determine whether the ALJ's decision is supported by substantial evidence, the Court will review the entire administrative record. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The Court will not, however, "reweigh the evidence, resolve conflicts, decide questions of credibility or substitute [its] own judgment for that of the Commissioner." *Id*. In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). Moreover, the court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to [her] conclusion," though she need not address every piece of evidence. *Clifford*, 227 F.3d at 872; *see McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) ("[A]n ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence'") (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2004). The Court will remand the case only where the Commissioner's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**BACKGROUND**

Plaintiff was 39 years old at the time of her alleged disability onset date of December 18, 2004. (R. at 154). She has no health insurance, nor a state medical card. (R. at 74).

## I. Relevant Medical History

Plaintiff has seen her primary care physician Dr. Shawn Bailey, M.D., consistently for many years. (R. at 76, 78). Plaintiff's first recorded visit with Dr. Bailey was on May 5, 2004. (R. at 440). Dr. Bailey assessed Plaintiff with chronic back pain and leg pain, and prescribed Vicodin[2] and Flexeril.[3] (R. at 440). At a follow-up visit with Dr. Bailey on July 23, 2004, he noted that Plaintiff showed signs of sciatica,[4] "but with normal imaging." (R. at 439). Dr. Bailey found that Plaintiff was limping and having cramp-like sensations in her leg in October and November of 2004. (R. at 371, 372). Additionally, Plaintiff was treated for irritable bowel syndrome. (R. at 370-72).

---

[2] Vicodin is a painkiller used to treat moderate to severe pain. *Vicodin*, Drugs.com, http://www.drugs.com/vicodin.html (last visited June 24, 2013) [hereinafter *Drugs.com*]

[3] Flexeril is a muscle relaxant used to treat pain or injury. *Drugs.com*.

[4] Sciatica is a condition in which pain radiates from the back into the buttock and along the leg. *Dorland's Medical Dictionary*, http://www.dorlands.com (last visited June 24, 2013) [hereinafter *Dorland's*].

Plaintiff saw Dr. Bailey again in April 2005, and was prescribed Vicodin and Quinine.[5] (R. at 368). Despite Plaintiff's continued back pain, Dr. Bailey wrote a note in May 2005 stating that Plaintiff was able to care for her grandchildren. (R. at 367).

On June 27, 2005, Plaintiff again saw Dr. Bailey, who found Plaintiff had trochanteric bursitis,[6] and noted that Plaintiff was in pain after running out of Vicodin. (R. at 364). Dr. Bailey ordered additional testing, asking Plaintiff to get an "EMG/nerve conduction study,"[7] though the testing was not performed. (R. at 364, 363). Dr. Bailey examined Plaintiff again on July 8, 2005, and noted that Plaintiff had left sacroiliitis[8] and continuing problems in her lower back. (R. at 363). Dr. Bailey noticed tenderness in Plaintiff's knee, heel, and left trochanter,[9] and noted that Plaintiff had a dysfunctional knee upon examination on September 13, 2005. (R. at 361).

On September 25, 2005, Plaintiff went to the emergency room complaining of lower back pain. (R. at 297). Dr. Alejandro Bernal examined Plaintiff, finding tenderness in Plaintiff's lumbar region, and the straight leg raise test was negative.

---

[5] Quinine is a drug primarily used to treat malaria, but is also prescribed to treat leg cramps. *Drugs.com.*

[6] Trochanteric bursitis is inflammation of the trochanteric bursa, which is a sac of fluid located in the thigh. *Dorland's.*

[7] EMG refers to electromyography, a diagnostic test that records skeletal muscle activity. Nerve conduction studies, also called electroneurography, measure nerve performance. *Dorland's.*

[8] Sacroiliitis is inflammation of the sacroiliac joint, the juncture between the sacrum and the ilium. *Dorland's.*

[9] The trochanter is a part of the femur bone. *Dorland's.*

(R. at 297). Additionally, Dr. Bernal diagnosed Plaintiff with degenerative disc disease. (R. at 297). Dr. Bernal prescribed Medrol Dosepak,[10] Skelaxin,[11] and Vicodin. (R. at 329). Two days later, Dr. Bailey's examination revealed tenderness in Plaintiff's lower back and sacroiliac joints. (R. at 360). Dr. Bailey injected Decadron[12] with Xylocaine[13] into each of Plaintiff's sacroiliac joints, and Dr. Bailey prescribed Valium[14] to help relax Plaintiff's muscles. (R. at 360). Three days later, Dr. Bailey found that Plaintiff had some tenderness, noting bilateral sacroiliitis, but the examination was otherwise unremarkable. (R. at 359). Plaintiff was released back to work after her October 7, 2005 visit. (R. at 357).

Plaintiff experienced shoulder pain in February 2006, and Dr. Bailey injected Decadron with Xylocaine into Plaintiff's right subacromial spot[15] with "excellent results." (R. at 355). Dr. Bailey renewed Plaintiff's Vicodin prescription on April 12, 2006, noting that Plaintiff continues to have back pain and "takes chronic Vicodin" for it. (R. at 354). In July and August of 2006, Plaintiff told Dr. Bailey that Vicodin was not helping her pain, and Dr. Bailey noted that Plaintiff's left leg pain was worsening. (R. at 349-50).

---

[10] Medrol Dosepak is the brand name of methylprednisolone, a steroid that prevents inflammation. *Drugs.com*.

[11] Skelaxin is a muscle relaxant used to treat acute skeletal muscle conditions such as pain. *Drugs.com*.

[12] Decadron is used to treat severe inflammation. *Drugs.com*.

[13] Xylocaine is a local anesthetic. *Drugs.com*.

[14] Valium is used to treat anxiety, alcohol withdrawal symptoms, or muscle spasms. *Drugs.com*.

[15] Subacromial spot refers to a space below part of the shoulder. *Dorland's*.

Dr. Steven Lukancic, M.D., a radiologist, found mild disc desiccation[16] at the T12-L1, L1-2, and L5-S1[17] levels in Plaintiff's MRI of September 1, 2006. (R. at 305). Further, Plaintiff's MRI revealed slight hypertrophic change[18] in the facet joints[19] at L4-5 and L5-S1, and a slight posterior disc protrusion at the L5-S1 level. (R. at 305). Dr. Lukancic found no evidence of significant disc herniation, spinal stenosis,[20] or neural foraminal stenosis.[21] (R. at 305). A lumbar x-ray taken the same day showed mild degenerative changes in the lumbar spine and right sacroiliac joint. (R. at 304).

On September 14, 2006, Plaintiff saw Dr. Deofil Orteza, M.D., a pain specialist, for evaluation and management of her lower back pain, as recommended by Dr. Bailey. (R. at 341-43). Dr. Orteza reported that Plaintiff had a limp and that her back pain was due to degenerative disc disease, and recommended a bilateral L3-4, L4-5, and L5-S1 facet joint injection. (R. at 342-43).

---

[16] Disc desiccation is a common degenerative change of the intervertebral discs of the spine. *Radiopaedia*, http://www.radiopaedia.org/articles/disc-desiccation (last visited June 24, 2013).

[17] T12-L1, L1-2 and L5-S1 are classifications of vertebrae placement. *Dorland's*.

[18] Hypertrophic change, also called hypertrophy, is an increase in the size of an organ or body part. *Dorland's*.

[19] Facet joints are small joints located between vertebrae. *Spine-Health*, http://www.spine-health.com/conditions/arthritis/facet-joint-disorders-and-back-pain (last visited June 24, 2013) [hereinafter *Spine-Health*].

[20] Spinal stenosis is "the narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." *Dorland's*.

[21] Neural foraminal stenosis refers to compression of the spinal nerve as it exits the spinal canal. *Spine-Health*.

Plaintiff saw Dr. Bailey again on January 5, 2007, and noted that Plaintiff had not yet gotten the joint injections recommended by Dr. Orteza. (R. at 348). Plaintiff also told Dr. Bailey that she had stopped taking her prescribed Vicodin because it was not helping. (R. at 348). Plaintiff was prescribed Celexa,[22] Sinemet,[23] and Flexeril. (R. at 348). On February 21, 2007, Plaintiff was having some discomfort, tenderness in her back, and was unable to bend over to touch her toes. (R. at 347).

Plaintiff continued seeing Dr. Bailey, and on August 15, 2007, Dr. Bailey prescribed Cymbalta[24] to help with Plaintiff's chronic and worsening depression. (R. at 410). Two months later, Dr. Bailey noted that Plaintiff did not "tolerate" Cymbalta. (R. at 410).

Plaintiff was prescribed Feldene[25] in November 2007, and again saw Dr. Bailey in January and February of 2008, at which time Dr. Bailey noted that Plaintiff had continued back pain and some muscle tenderness in her leg. (R. at 406, 407).

Plaintiff had seen a chiropractor, Dr. Patrick Westefer, in October of 2007 in an attempt to alleviate her back pain, but in response to the state Social Security

---

[22] Celexa is an antidepressant. *Drugs.com*.

[23] Sinemet is used to treat Parkinson's disease, muscle spasms, and poor muscle control. *Drugs.com*.

[24] Cymbalta is an antidepressant and anti-anxiety drug that is also used to treat chronic muscle or joint pain, such as low back pain. *Drugs.com*.

[25] Feldene, also called Piroxicam, is a non-steroidal anti-inflammatory drug (NSAID) used to treat pain and inflammation. It is typically used in arthritis treatment. *Drugs.com*.

Office's request for information in March 2008, Dr. Westefer remarked he had not treated Plaintiff regularly enough to "adequately assess her condition or her ability to respond to care." (R. at 458). Further, as he had only seen Plaintiff four times, Dr. Westefer stated he "simply [does] not have enough solid information on which to base [his] opinion." (R. at 459).

Plaintiff was examined by Dr. Phillip S. Budzenski on October 17, 2007. (R. at 376). Dr. Budzenski noted that Plaintiff ambulates with a left antalgia,[26] but that her gait is steady and predictable. (R. at 377).

On April 4, 2008, Plaintiff was examined by Dr. Mark B. Langgut, a clinical psychologist, who noted that Plaintiff complained of depression over the past two years, but that she had never sought treatment. (R. at 460). In his psychological assessment report, Dr. Langgut diagnosed Plaintiff with dysthymic disorder.[27] (R. at 463). He also found that Plaintiff has "average coherence and normal speed, flexibility, and suggestibility." (R. at 463).

Dr. Charles Wabner completed a Physical Residual Functional Capacity Assessment of Plaintiff on May 19, 2008. (R. at 478-85). Dr. Wabner listed Plaintiff's primary diagnosis as "chronic back dysfunction," and found that Plaintiff had some limitations, (R. at 479-83), but was capable of performing "light work." (R. at 478, 485).

---

[26] Antalgia, also called antalgic gait, is a "limp adopted so as to avoid pain on weight-bearing structures." *Dorland's.*

[27] Dysthymic disorder is a mood disorder characterized by depressed feelings that have persisted for over two years, but are not severe enough to be considered major depressive disorder. *Dorland's.*

On June 23, 2008, Dr. Bailey recommended epidural shots to Plaintiff's sacroiliac joint. (R. at 487). Two days later, Dr. Bailey provided Plaintiff with a note saying she was "unable to work until further notice." (R. at 488).

In July and August of 2008, about two years after Dr. Orteza first suggested injection therapy, Plaintiff received a series of lumbar epidural steroid injections from Dr. Orteza. (R. at 507-08, 512, 541). The following month, Dr. Bailey noted tenderness over Plaintiff's sacroiliac joint, and directed Plaintiff to increase her Vicodin to three times per day. (R. at 548).

In a letter dated February 16, 2009, Dr. Bailey wrote Plaintiff had lower back pain since 2002, but that MRIs of her back had not revealed any reason for the pain, and that medication had not made Plaintiff "comfortable enough to stay gainfully employed." (R. at 560).

Dr. Orteza completed a Lumbar Spine Impairment Questionnaire on April 21, 2009. (R. at 562-68). He noted that Plaintiff had lower back pain, mainly on the left side, with radicular pain[28] to the left leg, and that she was able to sit for less than one hour per day, and stand or walk for less than one hour per day. (R. at 563-64). Dr. Orteza further opined that Plaintiff had to get up and move around every one to two hours. (R. at 565). Dr. Orteza's Questionnaire notes that Plaintiff had a positive straight leg raise pain test, (R. at 563), though this is inconsistent with Dr. Orteza's most recent General Office Visit record of April 2009, which states "SLR – Negative." (R. at 579).

---

[28] Radicular pain, also called root pain, refers to pain caused by "disease of a sensory nerve root or roots" and is felt in the skin over the affected limb. *Dorland's*.

MRIs conducted on February 22, 2010 showed "no significant central canal stenosis," but evidence of cervical spondylosis.[29] Plaintiff's most recent medical evidence comes from Dr. Rakesh K. Garg, M.D., in a letter dated March 16, 2010. (R. at 610). In this letter, Dr. Garg noted that Plaintiff's pain may stem from a spinal cord problem, but that her spinal cord MRI was normal, and he suggested Plaintiff get a second opinion, as Dr. Garg was unable to determine the cause of Plaintiff's pain. (R. at 610).

## II. Hearing Testimony

Plaintiff appeared at a hearing before the ALJ on March 29, 2010. (R. at 64). Attorney Walter J. Schultz represented Plaintiff, and Vocational Expert Dennis W. Gustafson testified. (R. at 64).

The ALJ began by asking some introductory questions, and then proceeded to ask about Plaintiff's activities. (R. at 69-73). Plaintiff was last employed at a restaurant, and stopped working there in December 2005, because the restaurant had closed after Plaintiff went on medical leave. (R. at 75).

Plaintiff testified to having trouble climbing stairs, (R. at 71), lifting, standing for long hours, bending, stretching and reaching (R. at 76). She can stand for thirty to forty-five minutes before needing to sit down, and can sit for the same amount of time before needing to "get up and move." (R. at 77). After walking a block, Plaintiff needs to stop and rest for about ten minutes before she can continue walking. (R. at 77-78). Plaintiff testified that she is "in constant pain," and that she spends most of her days in a recliner, on the couch, or lying in her at-home hospital

---

[29] Cervical spondylosis is a degenerative joint disease affecting the vertebrae and surrounding tissue. *Dorland's.*

bed. (R. at 79). She watches a lot of television, cooks daily, drives her fiancé to and from work each day, and occasionally visits with her daughter. (R. at 80). Plaintiff also testified that she is able to go shopping twice a month, (R. at 80), and that she can do dishes and laundry, but has some trouble doing those activities. (R. at 81). Plaintiff walks with a cane, and prefers to shower rather than take baths because she has trouble getting in and out of the bathtub. (R. at 82-83).

When asked about her hobbies, Plaintiff stated she has none. (R. at 84). Plaintiff also said that she does not go out to dinner, or to movies, and that while she used to enjoy gardening, she no longer does. (R. at 84). Plaintiff smokes one pack of cigarettes each day. (R. at 73).

Plaintiff testified that she sees four of her grandchildren two to three times a week, and that she often babysits them. (R. at 85). The youngest is seven months old, and weighs around ten pounds according to Plaintiff, and the oldest is seven years old. (R. at 86). Plaintiff tries not to hold or lift her infant grandchild, but does hold her, though Plaintiff was not clear on how often. (R. at 86).

When asked about her pain levels, Plaintiff claimed to be at a six on scale of zero to ten when medicated, and at a nine when not medicated. (R. at 87). Weather changes also affect Plaintiff's pain level. (R. at 87). Plaintiff first stated that her legs "give out" every two to three months, (R. at 71), but then that her leg "goes out" a few times each month. (R. at 82). She uses heat and ice to get temporary pain relief, (R. at 79), and takes Piroxicam[30] and Vicodin daily to help ease her pain. (R. at 78).

---

[30] Piroxicam is also sold under the name Feldene.

Plaintiff explained that her pain is located in her lower back, hip, neck, left leg, and left foot. (R. at 79).

After questioning the Plaintiff, the ALJ proceeded to question the Vocational Expert ("VE"). The ALJ posed hypothetical questions to the VE, first asking about Plaintiff's ability to return to past work. (R. at 90). The VE testified Plaintiff could not return to prior work given the limitations posed by the ALJ. (R. at 90). However, the VE found that Plaintiff was suited to sedentary jobs, such as unskilled accounting clerks, interviewers, order clerks, and general office clerks. (R. at 90-91). The VE testified that this was a "representative list" that did not include all possible jobs. (R. at 91). Further, the VE testified that in Illinois there were 3,050 unskilled accounting clerk jobs; 840 interviewer jobs; 1,190 order clerk jobs; and 4,970 general office clerk jobs. (R. at 90-91).

The ALJ then asked what work would be available if Plaintiff had additional restrictions, such as needing a fifteen minute break each hour, or needing to sit for less than one hour in an eight-hour workday and lift no more than ten pounds. (R. at 91). The VE testified that those restrictions would rule out all regular employment. (R. at 91).

## III. The ALJ's Decision

The ALJ issued a decision on April 15, 2010, denying Plaintiff's claim for benefits. (R. at 45). The ALJ applied the five-step sequential process outlined above. (R. at 49-50). Applying the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (R. at 50). The ALJ then found Plaintiff had a severe impairment, specifically "chronic back

dysfunction." (R. at 50). At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (R. at 51). Notably, the ALJ found Plaintiff's back disorder did not involve compromise to the nerve root or the spinal cord with accompanying limitations as required to satisfy Listing 1.04. (R. at 51).

Next, the ALJ considered Plaintiff's residual functional capacity ("RFC"). The ALJ found that although Plaintiff's impairments "cause more than minimal limitations," (R. at 51), in her ability to work, Plaintiff still was capable of performing some jobs. (R. at 52). Furthermore, the ALJ found "facts and inconsistencies in the record which detract from the credibility" of Plaintiff, such as inconsistent medical reports. (R. at 55). Additionally, the ALJ found that Plaintiff's alleged limitations and symptoms were not consistent with the objective medical evidence. (R. at 55).

Thus, considering the entire record, the ALJ found that Plaintiff was able to work at a "sedentary exertional level" with some limitations, such as the option to sit or stand at will; the option to alternate her position at will at least once every thirty minutes; and the inability to stand or walk for more than two hours in an eight-hour day. (R. at 56). Also, the ALJ found that Plaintiff is not capable of performing her past relevant work. (R. at 56). Further, the ALJ concluded that Plaintiff, considering her limitations, could "perform the requirements of representative occupations such as: accounting clerk, with 3,050 jobs existing in Illinois; interviewer, with 840 jobs existing in Illinois; order clerk, with 1,190 jobs

existing in Illinois; and, general office clerk, with 4,970 jobs existing in Illinois." (R. at 57).

The ALJ ultimately concluded that given the Plaintiff's age, education, work experience, and RFC, Plaintiff is capable of finding other work and is thus not disabled under section 216(i) and 223(d) of the Social Security Act. (R. at 57, 58).

## DISCUSSION

Plaintiff raises numerous issues in her Memorandum in Support of Motion for Summary of Judgment (Doc. 12), some of which overlap or are not stated clearly. Plaintiff has the responsibility of identifying the specific findings of the ALJ which are contrary to law, citing "to the record by page number the factual evidence which supports" her position, as well as the "statute, regulation or case law under which the Commissioner allegedly erred." CDIL-LR 8.1(D). Despite this requirement, Plaintiff's brief is unclear and confusing, and frequently does not clearly identify the problematic findings or legal support. The Court "cannot fill the void by crafting arguments and performing the necessary legal research." *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). This rule applies to pro se plaintiffs, but should be even more true when, as here, a plaintiff is represented by counsel. Thus, although the Court attempted to construe the numerous claims and assess them accordingly, the Court did not create arguments for the Plaintiff. To the extent arguments were missed, the Court reminds Plaintiff and Plaintiff's counsel that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

Plaintiff raises the following issues in her brief: 1) the ALJ failed to consider Plaintiff's severe impairment at step two of the sequential analysis; 2) the ALJ failed to give adequate weight to Dr. Orteza's opinion of April 21, 2009, and Dr. Bailey's opinion of March 24, 2010; 3) the ALJ ignored Dr. Garg's observation that Plaintiff may have primary lateral sclerosis; 4) the ALJ did not comply with step five of the sequential analysis in determining whether Plaintiff can do other work; and 5) the ALJ failed to properly evaluate Plaintiff's credibility. The Court will discuss these issues in turn.

## I. Plaintiff's Severe Impairment

Plaintiff argues that the ALJ failed to consider Plaintiff's severe impairment at step two of the analysis. This argument is confusing, as the ALJ very clearly determined that Plaintiff does indeed have chronic back dysfunction, a severe impairment. Plaintiff alleges the ALJ erred in finding that Plaintiff's chronic back dysfunction has no "medically determinable evidence of any functional limitation that results from the existence of this impairment." (R. at 50; Doc. 12 at 10). To the extent Plaintiff challenges more than simply the step two determination, this Court finds the ALJ's analysis was sufficient, and the ALJ provided adequate support for her conclusion that Plaintiff's functional limitations were at worst only mild limitations.

Plaintiff mentions in her brief three pieces of evidence in support of her claim. First, Plaintiff points to statements within the RFC assessment conducted by Dr. Charles Wabner. (Doc. 12 at 10; R. at 485). Plaintiff alleges the ALJ failed to consider Dr. Wabner's statement. However, the ALJ cited to this piece of evidence

in her decision, and Dr. Wabner's statements are consistent with what the ALJ concluded regarding Plaintiff's severe impairment. (R. at 50, 485). Dr. Wabner stated that Plaintiff did have some functional limitations, but that those limitations were not supported by objective medical evidence. (R. at 485). Therefore, the ALJ's conclusion that there is no "medically determinable evidence of any functional limitation" resulting from Plaintiff's impairment is consistent with the statement made by Dr. Wabner.  (R. at 50).

Second, Plaintiff points to statements made by Dr. Langgut as support for her claim. (Doc. 12 at 10). As part of his initial observation upon meeting Plaintiff, Dr. Langgut stated that Plaintiff used a cane and walked slowly, that she had difficulty remaining seated or standing, and that her gait was impaired. (R. at 460, 462). Because Dr. Langgut is a psychologist who examined Plaintiff's mental capacity rather than her physical condition, it would be proper for the ALJ to give less weight to Dr. Langgut's statements about Plaintiff's physical condition. 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ need not discuss every piece of evident, and the Court finds no error in failing to discuss the specific statements made by Dr. Langgut that Plaintiff cited in her brief.

Lastly, Plaintiff cites to a physical evaluation conducted by Dr. Phillip S. Budzenski. (Doc. 12 at 10-11). Dr. Budzenski noted that Plaintiff "ambulates with a left antalgia." (R. at 377). Though the ALJ did not comment directly on Dr. Budzenski's findings, she did discuss Plaintiff's symptoms and ability to walk, and concluded that Plaintiff has a severe impairment. (R. at 50-58).

The ALJ did conclude that Plaintiff's impairment was severe, but found there was no medically determinable evidence of a functional limitation resulting from Plaintiff's severe impairment. (R. at 50). The ALJ cited relevant medical evidence in reaching this conclusion. (R. at 50-51). For instance, the ALJ noted that Plaintiff's testimony about her daily activities is inconsistent with the objective evidence, and that MRI results and other medical evidence yielded normal results. (R. at 55). This Court finds the ALJ's decision meets the substantial evidence requirement, and Plaintiff's first claim is rejected.

## II. Weight Given to Dr. Orteza's and Dr. Bailey's Opinions

Plaintiff argues that "no weight" was given to Dr. Orteza's opinion of April 21, 2009, or to Dr. Bailey's opinion of March 24, 2010. (Doc. 12 at 11). If a treating physician's opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in a plaintiff's case record, that opinion will be given controlling weight. 20 C.F.R. § 404.1527(c)(2). An ALJ can reject a treating physician's opinion, even where the opinion is well supported, if it is inconsistent with other substantial evidence in the record. SSR 96-2p, 1996 WL 374188 (July 2, 1996). A case can be remanded when an ALJ discounts a well-supported medical opinion, or when an ALJ fails to provide adequate reasoning of support of her decision to discount a medical opinion. *Punzio v. Astrue*, 630 F.3d 704, 709-713 (7th Cir. 2011); *Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007); 20 C.F.R. § 404.1527(c).

Upon examination of Dr. Orteza's and Dr. Bailey's opinions, the ALJ concluded that "neither doctor's opinion is consistent with the medical and other

evidence" in the record. (R. at 55). Thus, those opinions were given weight "only to extent that they correspond to the RFC finding," (R. at 55), in accordance with 20 C.F.R. § 404.1527(c)(2-6). Plaintiff's argument that these opinions were given "no weight" is an incorrect view of the ALJ's decision, given the ALJ explicitly states the weight afforded to each opinion. (Doc. 12 at 11; R. at 55). Further, as explained below, the ALJ adequately explained her decisions to give both doctors' opinions less than controlling weight.

## A. Dr. Orteza's Opinion

Plaintiff argues the ALJ misstated facts from Dr. Orteza's opinion. (Doc. 12 at 11-12). The ALJ was mistaken in stating that Dr. Orteza found a negative straight leg raise test in August of 2008, when in fact the examination took place in April of 2009. (R. at 54, 562, 579). However, this mistake is likely due to Dr. Orteza himself writing in the Lumbar Spine Impairment Questionnaire and on his General Office Visit notes from the same day that he last saw Plaintiff on August 21, 2008. (R. at 562, 579). The ALJ was simply relying on Dr. Orteza's own statements about what medical evidence his opinion relied on. Further, it does not help Plaintiff's case to point out that the *most recent* straight leg test of April 2009 was negative. This mistaken date is not grounds for remand, and there is no indication that the ALJ gave improper weight to Dr. Orteza's opinion based on the mistaken date.

Further, Plaintiff is mistaken when she alleges in her brief that the ALJ misinterpreted Dr. Orteza's medical opinion. (Doc. 12 at 12). Plaintiff states that the straight leg raise was negative in August 2008, but was positive "when re-examined in 2009." (Doc. 12 at 12). This inaccurately conflates Dr. Orteza's

questionnaire with the notes he took during an examination that took place on the same day the questionnaire was filled out. (Doc. 12 at 12; *see also* R. at 562, 579). The ALJ was correct in finding that Dr. Orteza's questionnaire was not supported by his previous medical notes, as the two were inconsistent regarding the straight leg raise test. Such a lack of support and inconsistency is an acceptable reason to give less weight to Dr. Orteza's opinion. *See* 20 C.F.R. § 404.1527(c).

Next, Plaintiff argues that the ALJ misstated facts from Dr. Orteza's notes when the ALJ found there "was no evidence in the record to support [Dr. Orteza's] opinion" regarding Plaintiff's ability to hold her neck steady. (Doc. 12 at 12; R. at 54). Plaintiff asserts that the ALJ "ignores anatomy" since "[a] person unable to hold her back steady cannot hold her neck steady." (Doc. 12 at 12). Plaintiff points to no evidence in the record to support Dr. Orteza's opinion that Plaintiff cannot hold her neck steady. Because there is no objective evidence supporting Dr. Orteza's opinion about Plaintiff's neck, nor is there any objective evidence supporting Plaintiff's assertion about her ability to hold her back steady, the ALJ was correct in giving less weight to Dr. Orteza's statements. *See* 20 C.F.R. § 404.1527(c).

Moreover, Plaintiff claims the ALJ "incorrectly states the 2006 MRI did not show spinal stenosis." (Doc 12. at 11). Dr. Steven Lukancic, the radiologist who interpreted the MRI, reported the following: "Mild degenerative disc and facet joint disease involving the lumbar spine as described above but *no evidence for* significant disc herniation, *spinal stenosis*, neural foraminal stenosis, or impingement on the exiting nerve roots." (R. at 340) (emphasis added). Dr. Orteza noted on July 23, 2008 that "spinal stenosis [is] most likely." (R. at 507). The ALJ

explained that the 2006 MRI was the "latest available objective medical evidence at the time [Dr. Orteza] gave his opinion," and the MRI results are inconsistent with what Dr. Orteza reported in his statements. (R. at 54; *see also* R. at 340, 507). Thus, Plaintiff is incorrect: Dr. Orteza's opinion that Plaintiff had spinal stenosis was unsupported by objective medical evidence, and the ALJ was justified in discounting Dr. Orteza's opinion. *See* 20 C.F.R. § 404.1527(c).

Finally, Plaintiff claims that the ALJ incorrectly stated that Plaintiff "did not have the facet joint injection until 2008." (Doc. 12 at 11). Dr. Orteza first recommended that Plaintiff receive injection therapy in 2006. (R. at 343). On January 1, 2007, Dr. Bailey noted that Plaintiff had not yet received any injections from Dr. Orteza. It was not until July and August of 2008 that Plaintiff received a series of three epidural steroid injections. (R. at 533-543). Thus, the ALJ correctly found that Plaintiff received injection therapy from Dr. Orteza in 2008, two years after the injections were first recommended. (R. at 54). Therefore, Plaintiff's claim has no merit.

## B. Dr. Bailey's Opinion

Regarding Dr. Bailey's opinion, Plaintiff argues the ALJ did not give adequate weight to the doctor's findings, though the ALJ found inconsistencies between the objective medical evidence in the record and Dr. Bailey's reports. (Doc. 12 at 12-13; R. at 54-55). Because Dr. Bailey's opinion was also inconsistent with objective medical evidence in the case record, the ALJ properly afforded lesser weight to the opinion. *See* 20 C.F.R. § 404.1527(c).

The ALJ noted multiple inconsistencies in Dr. Bailey's records, stating his records "provide very little in the way of determinable medical evidence in support of his opinion," and that Dr. Bailey's opinion is inconsistent with "the objective medical evidence in the record." (R. at 55). For example, Dr. Bailey stated in his Multiple Impairment Questionnaire that Plaintiff has been limited in her work capabilities since December 2002. (R. at 618). However, "when [Plaintiff] asked, [Dr. Bailey] wrote a note stating that [Plaintiff] could watch her grandchild on May 4, 2005 so that she could get public aid for taking care of the granddaughter while her daughter got her GED." (R. at 54, 367). Additionally, the ALJ cited to Dr. Bailey's notes from October 7, 2005, where Dr. Bailey "signed a release for [Plaintiff] to go back to work on the following Monday." (R. at 54, 357). On June 23, 2008, Dr. Bailey noted that Plaintiff was having trouble finding a job. (R. at 487). Two days later, he restricted Plaintiff from working "until further notice." (R. at 488). There is an inconsistency here, as Dr. Bailey claims Plaintiff has been limited in her work capabilities since 2002, yet he signed releases for Plaintiff to return to work in 2005 and 2008, commented on her job search, and only restricted her from working in June of 2008.

Plaintiff argues the ALJ should have considered that symptoms can vary in their intensity and persistence, and that this may be why Dr. Bailey would release Plaintiff to work. (Doc. 12 at 12; *see* R. at 54, 367, 358). Plaintiff also argues "these releases are not consistent with the ability to perform competitive employment," and that Dr. Bailey did not believe Plaintiff was capable of working at the level of substantial gainful activity. (Doc. 12 at 12). On its own, a temporary release to work

does not necessarily rule out a finding of disability. However, Dr. Bailey releasing Plaintiff to work is inconsistent with his own opinion that Plaintiff was disabled, unable to carry anything, and only able to occasionally lift items weighing less than five pounds. (R. at 615). Moreover, because the Commissioner "is charged with determining the ultimate issue of disability," treating physicians' statements about Plaintiff's ability to work are irrelevant, and Plaintiff's argument fails. 20 C.F.R. § 404.1527(d).

Further, Plaintiff suggests that the ALJ assumed Dr. Bailey's sympathy toward Plaintiff meant that Dr. Bailey lied in order to help Plaintiff collect disability benefits, and that this speculation was why the ALJ discounted Dr. Bailey's opinion. (Doc. 12 at 13). However, the ALJ did not give controlling weight to Dr. Bailey's opinion because it was not well supported, and was inconsistent with other objective medical evidence. (R. at 54). Dr. Bailey's opinion and treatment records were considered, and the ALJ relied both on that evidence and on other objective evidence in the record when making her decision. (R. at 54-55). The ALJ mentions in her decision Dr. Bailey's sympathy towards Plaintiff. (R. at 55). Plaintiff argues that the ALJ improperly considered Dr. Bailey's sympathy in determining what weight to afford Dr. Bailey's opinion. (Doc. 12 at 13). However, Dr. Bailey's sympathy was a valid factor to consider, as much of the record indicates that Dr. Bailey did display some sympathy toward Plaintiff during the many years she was under his care. Further, the Seventh Circuit has held that a treating physician's sympathy, and possible bias stemming from that sympathy, can be

considered. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Merely mentioning Dr. Bailey's potential sympathy is not error.

The ALJ did not reject Dr. Bailey's opinion outright, but only to the extent it conflicted with other objective evidence. (R. at 55). Thus, the ALJ afforded lesser weight to Dr. Bailey's opinions due to the inconsistencies within Dr. Bailey's opinion and between his opinion and other objective evidence. Accordingly, this Court finds no error. *See* 20 C.F.R. § 404.1527(c).

**C. Dr. Westefer's Opinion**

Plaintiff further argues that the ALJ should have considered the findings of Dr. Patrick Westefer as support for Dr. Bailey's and Dr. Orteza's opinions. (Doc. 12 at 12). Dr. Westefer, a chiropractor, saw Plaintiff only four times between October 1, 2007 and March of 2008, and thus found it "is difficult to impossible to adequately assess her condition." (R. at 458). Dr. Westefer noted that Plaintiff had "a moderately to severely short left leg," that she "was moderately left leaning," and "walked with a moderate left sided limp." (R. at 458). Plaintiff points to Dr. Westefer's comment that Plaintiff "would probably have difficulty fulfilling the demands of a steady job requiring much physical activity such as standing, walking, lifting, etc., without difficulty and pain." (R. at 459). Plaintiff's argument fails here for three reasons.

First, a "statement by a medical source that [a claimant is] disabled or unable to work" does not mean that a claimant is disabled, as the Commissioner is ultimately responsible for determining disability. 20 C.F.R. 404.1527(d)(1). Second, Dr. Westefer himself states he is not able to provide a well-supported opinion on

Plaintiff's condition. (R. at 458-59). He states, "I feel it is very difficult for me to voice an adequate opinion as to this lady's condition, simply because I have treated her so infrequently in the previous 3 years. It is impossible to predict her response to care at this rate of treatment." (R. at 458-459). Further, he remarks, "I simply do not have enough solid information on which to base my opinion." (R. at 459). Lastly, even if the ALJ had addressed Dr. Westefer's letter, Dr. Westefer's opinion was that Plaintiff might have trouble performing a "job requiring *much physical activity*." (R. at 459). Plaintiff's RFC limits her to sedentary work, and the ALJ agrees that Plaintiff would not be able to perform a job requiring a higher level of physical activity. (R. at 52).

Because an ALJ is not required to address every piece of evidence in the record, *Clifford*, 227 F.3d at 872, and because Dr. Westefer himself felt he could not adequately assess Plaintiff's condition, the ALJ committed no error by failing to consider Dr. Westefer's letter as support for the opinions of Dr. Bailey and Dr. Orteza.

An ALJ may reject a treating physician's opinion when it is unsupported by objective evidence or where it is inconsistent with the other substantial evidence in the record. SSR 96-2p. Because the ALJ's decision to give less weight to Dr. Orteza's and Dr. Bailey's opinions was supported by substantial evidence from the record, the Court affirms her decision as to the weight afforded these medical opinions.

### III. Dr. Garg's Suggestion of Primary Lateral Sclerosis

Plaintiff claims that the ALJ ignored evidence that suggested Plaintiff may have primary lateral sclerosis.[31] (Doc. 12 at 13). Nowhere in Plaintiff's brief does she cite to Dr. Garg's medical opinion, treatment notes, or to any support for her claim. As noted above, a plaintiff is obligated to "cite to the record by page number the factual evidence which supports the plaintiff's positions." CDIL-LR 8.1(D). Although the Court is not required to do so, it will consider this claim on the merits.

Dr. Garg wrote, in a letter dated March 16, 2010, that some of Plaintiff's symptoms indicate a spinal cord problem, but that an MRI of the brain and entire spinal cord was normal. (R. at 610). In the letter, Dr. Garg stated, "I do not know what is the exact cause of her problem, but my guess is primary lateral sclerosis." (R. at 610). Dr. Garg offered primary lateral sclerosis as a potential diagnosis, but only if additional testing was done and only if that additional testing yielded certain results. (R. at 610). Dr. Garg offers no support for his opinion that Plaintiff may have primary lateral sclerosis, and he suggests that Plaintiff seek treatment elsewhere. (R. at 610).

The March 16, 2010, letter is the only piece of evidence in the record from Dr. Garg, and it suggests that he did not have a substantial treatment relationship with Plaintiff. *See* 20 C.F.R. 404.1527(c)(2). Additionally, the lack of support for Dr. Garg's "guess" about Plaintiff's condition is an adequate reason for the ALJ not to consider Dr Garg's letter. (R. at 610; *see* 20 C.F.R. 404.1527(c)(2-3)). Furthermore, an ALJ is not required to address every piece of evidence, especially a hypothesis in

---

[31] Primary lateral sclerosis is a motor neuron disease affecting the spine. *Dorland's*.

a short letter without objective support. *Clifford*, 227 F.3d at 872. Additionally, it should be noted that having a diagnosis does not mean a person is disabled. The ALJ must consider not only whether a claimant has an impairment, but must further evaluate the impairment using the five-step sequential analysis. 20 C.F.R. § 404.1520. Thus, even if Plaintiff did have an additional diagnosis of primary lateral sclerosis, the ALJ would still have to complete the remaining steps of the analysis, and it is likely that the ALJ's decision would remain the same. Plaintiff's claim that the ALJ failed to consider Dr. Garg's opinion is therefore rejected.

## IV. The ALJ's Compliance with Step Five of the Sequential Analysis

Plaintiff argues the ALJ failed "to comply with the requirements of step five in the sequential process of determining whether claimant is capable of work in the national economy." (Doc. 12 at 14). At step five, the "Commissioner bears the burden of showing that there are a significant number of jobs that the claimant is capable of performing," and a VE's testimony typically satisfies that burden. *Liskowitz v. Astrue*, 559 F.3d 736, 742-743 (7th Cir. 2009); *see* 20 C.F.R. § 404.1560(c)(2).

Plaintiff argues that the ALJ failed to develop the record as required by Social Security Ruling ("SSR") No. 00-4p, failed to obtain the *Dictionary of Occupational Titles* ("DOT") number of jobs identified in her decision, and failed to question the VE about any inconsistencies. Moreover, Plaintiff argues the DOT does not address the option to sit or stand at will, and the VE's list of jobs are not unskilled; the hypotheticals posed to the VE are confusing and inconsistent; the ALJ failed to consider how Plaintiff's symptoms would interfere with her

"concentration, persistence and pace"; and the VE agreed that an employee needing fifteen-minute breaks each hour would be precluded from holding any job. (Doc. 12 at 15-16).

First, Plaintiff alleges the ALJ failed to comply with SSR 00-4p by not questioning the VE about inconsistencies with the DOT and resolving any apparent inconsistency, and by not including the DOT numbers in her report. (Doc. 12 at 14-15). SSR 00-4p requires that an ALJ, before relying on VE evidence, ask about any potential conflicts between the VE's testimony and the information in the DOT. SSR 00-4p. 2000 WL 1898704 (Dec. 4, 2000); *see also Overman v. Astrue*, 546 F.3d 456 (7th Cir. 2008). Further, even if the VE confirms that his testimony consisted with the DOT, if there is an apparent conflict between the VE's evidence and the DOT, the ALJ must obtain a "reasonable explanation" for the conflict. *Overman,* 546 F.3d at 463. "A conflict is apparent if it is 'so obvious that the ALJ should have picked up on [it] without any assistance.'" *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011) (quoting *Overman*, 546 F.3d at 463). When a conflict is identified or made apparent, the ALJ must resolve the conflict before she can rely on the VE's evidence. *Overman,* 546 F.3d at 463.

Although the ALJ did not directly ask the VE whether his testimony was inconsistent with the DOT, she stated, "I'll further assume that your testimony will be consistent with the *Dictionary of Occupational Titles* unless you tell me otherwise." (R. at 89). The Seventh Circuit has recognized the affirmative duty to question VEs about possible conflicts, but has established no "singular method by which ALJs must elicit potential conflicts." *Weatherbee,* 649 F.3d at 570. As in the

present case, in *Harris v. Astrue*, 646 F. Supp. 2d 979 (N.D. Ill. 2009), the court found it sufficient for the ALJ to instruct the VE "to note where she differs from the DOT." *Id*. at 995.

Plaintiff further argues that the ALJ erred in not resolving a potential conflict between the VE's testimony and the DOT before relying on the VE's testimony. (Doc. 12 at 15-16). However, no conflict exists. Plaintiff alleges that the jobs the VE identified during his testimony require a higher level of skill than Plaintiff is capable of performing as per the ALJ's RFC assessment. (Doc. 12 at 15-16). The ALJ stated in her decision, "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she requires the option to sit or stand at will, she can stand and/or walk no more than 2 hours of an 8 hour day, she must be able to alternate her position at will, but at least once every 30 minutes." (R. at 52). Nowhere in the ALJ's RFC assessment does she limit Plaintiff to "unskilled" work, a point that Plaintiff concedes in her brief, stating the "RFC does not specifically limit claimant to unskilled work." (Doc. 12 at 15). Though the VE mentioned "sedentary, unskilled" jobs in his testimony, this mistake is irrelevant, as the jobs identified are all sedentary and correspond to Plaintiff's RFC. (R. at 52). Thus, there is no conflict.

Further, Plaintiff alleges the ALJ erred in not including specific DOT numbers in her written decision, and argues that the DOT does not address options to sit and stand. (Doc. 12 at 15). However, SSR 00-4p does not require the publication of DOT numbers in ALJ decisions, and states that the DOT is not the

exclusive source of job information. SSR 00-4p; *see also Mueller v. Astrue*, 860 F. Supp.2d 615, 640 (N.D. Ill. 2012) ("SSR 00-4p does not demand any citation to code numbers."). Additionally, although the DOT does not address options to sit and stand, the DOT is not the only source of information on which ALJs can rely. ALJs may rely on VE testimony, even when it differs from the DOT. SSR 00-4p. Because VEs are qualified to discuss job information, even information not available in the DOT, there was no error here in the ALJ allowing the VE to testify about options to sit or stand. SSR 00-4p; *see also Overman*, 546 F.3d at 465. Therefore, the ALJ was not required to list specific DOT numbers in her decision, and because the DOT is not the only source of job information, there is no error in discussing options to sit and stand.

Next, Plaintiff argues that the hypothetical questions asked of the VE were inconsistent and confusing. Once again, Plaintiff does not cite to any part of the record, nor to any relevant authorities, regarding this claim. (R. at 16). Also, Plaintiff misstates the ALJ's question. (R. at 16). The ALJ asked the VE to

> "assume further that the individual would be precluded from standing and walking more than two hours out of an eight-hour workday, but would need to change positions at will and that position change would have to have – occur at least once every 30 minutes, how would that affect the individual's ability to return to the claimant's past work?"

(R. at 90). Plaintiff argues that "the option to change positions at will allows for very frequent changes but the option to change at least once every 30 minutes is more restrictive." (Doc. 12 at 16). The Court rejects Plaintiff's claim and finds no inconsistency in the ALJ's question. Plaintiff mischaracterizes the ALJ's question as two separate hypothetical options, when the question really poses just one

hypothetical option: the option to change position at will at least once every thirty minutes. (R. at 90). "At will" simply means at the discretion of the employee, rather than at specified times of day or at the discretion of the employer. There is no inconsistency between changing positions at will and the further clarification that such position changes should occur at least once in a thirty-minute time period. Thus, there is no internal inconsistency in the ALJ's question.

Additionally, Plaintiff argues that the ALJ failed to consider Plaintiff's limitations that may "create problems at work," in her analysis of Plaintiff's RFC. (Doc. 12 at 16). Plaintiff again fails to cite to any evidence in support of this claim, but the Court will nonetheless consider Plaintiff's arguments on the merits.

The ALJ concluded that Plaintiff's lower back pain could "reasonably be expected to cause limitations," but noted that the degree of pain and the alleged limitations caused by pain were "not consistent with the objective medical evidence regarding these impairments, or her functional ability." (R. at 55). The ALJ supports this finding with evidence from Plaintiff's hearing testimony, pointing out the inconsistencies between Plaintiff's alleged symptoms and the objective evidence. (R. at 55-56). For example, Plaintiff is capable of dressing herself, caring for her personal hygiene, driving, doing most household work, and said that vacuuming is the only household function she definitely does not do. (R. at 55-56). Additionally, Plaintiff testified to babysitting and holding her seven-month old granddaughter, who is "likely much heavier than [Plaintiff's] 10 pound estimate." (R. at 56). Moreover, the ALJ noted that Plaintiff tended to provide evasive answers, and that Plaintiff's testimony was "ambiguous to the point that it diminishes [Plaintiff's]

credibility." (R. at 56). The Court finds that the ALJ used substantial evidence to support her analysis of Plaintiff's RFC, and Plaintiff's claim fails.

Plaintiff also mentions, "The VE agreed that if the employee would need a 15 minutes break every hour, or had more than two absences per month, that would rule out any job." (Doc. 12 at 16). While the VE did testify that an employee taking a fifteen-minute break every hour or missing work more than twice a month would not be employable, the ALJ did not include those limitations in Plaintiff's RFC assessment, and thus these limitations played no role in the ALJ's determination of Plaintiff's disability status. (R. at 56, 91, 92).

## V. Plaintiff's Credibility

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility using the seven factors found in 20 C.F.R. § 404.1529(c). (Doc. 12 at 16-17). "In disability insurance cases, an ALJ's credibility determinations are 'afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility.'" *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008) (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). Accordingly, an ALJ's credibility determination will only be overturned if it is "patently wrong." *Id*. at 668. A credibility determination is patently wrong if it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Here, the ALJ stated in her decision, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment," (R. at 53), and cited to various pieces of the record in supporting that determination. (R. at 55-56).

The seven factors to which Plaintiff refers are the factors relevant to a claimant's pain apart from objective medical evidence. 20 C.F.R. § 404.1529(c).  The ALJ must consider the following: i) a claimant's daily activities; ii) the location, duration, frequency, and intensity of a claimant's pain or other symptoms; iii) precipitating and aggravating factors; iv) the type, dosage, effectiveness, and side effects of any medication a claimant takes or has taken; v) treatment a claimant received; vi) any measures a claimant uses or has used to relieve pain or other symptoms; and vii) other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

Plaintiff makes general statements contesting the ALJ's conclusion without pointing to any persuasive evidence that indicates to the Court that the ALJ's credibility determination was patently wrong. Plaintiff first argues that the ALJ failed to properly evaluate claimant's daily activities because Plaintiff's "limited activities do not indicate the ability to do competitive employment." (Doc. 12 at 16). "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford,* 227 F.3d at 872. Additionally, "[a]n ALJ cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Where the ALJ does not exaggerate Plaintiff's testimony and considers the limiting qualifications, however, the factual determination is not improper simply because an alternative conclusion could have been reached. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Here, the ALJ wrote that Plaintiff "is generally self-sufficient in personal hygiene, daily living and social activities. She drives her fiancé to work everyday,

she performs many of the cleaning activities of the household . . . [and] baby sits for her grandchildren." (R. at 55-56). Moreover, the ALJ noted that Dr. Bailey had signed a note releasing Plaintiff to work, and additionally had written a note stating Plaintiff could baby-sit her grandchildren. (R. at 54). The ALJ, after considering Plaintiff's testimony regarding her daily activities, concluded that those daily activities were inconsistent with Plaintiff's asserted limitations. (R. at 53). The Court finds the ALJ completed a sufficient analysis of Plaintiff's daily activities.

Second, Plaintiff generally criticizes the ALJ for not factoring in the location, duration, frequency, and intensity of Plaintiff's pain and other symptoms, stating "pain is constant and severe radiating down left leg to foot. She has left leg weakness, hyperactive reflexes, and clonus,[32] consistent with nerve root irritation and/or [primary lateral sclerosis]." (Doc. 12 at 17). The ALJ, however, spent much of her written decision explaining that despite the fact that "claimant has pain in her lower back that could reasonably be expected to cause limitation," she still believed that the objective medical evidence and Plaintiff's testimony did not demonstrate that Plaintiff's pain rendered her disabled. (R. at 52-56). For example, the ALJ points to the inconsistencies between the objective medical evidence and Plaintiff's own testimony about her pain and daily activities. (R. at 55). Thus, the ALJ opinion sufficiently demonstrates that she considered the location, duration, frequency, and intensity of Plaintiff's pain in her decision.

---

[32] Clonus is a continuous reflex tremor, often initiated in the spinal cord. *Dorland's*.

Plaintiff next writes that "[l]ifting, weather changes and all positions except reclining with feet elevated" precipitate and aggravate Plaintiff's symptoms. (Doc. 12 at 17). Plaintiff fails to cite to any part of the record discussing Plaintiff's symptoms when reclining with feet elevated. Again, the ALJ considered Plaintiff's statements about her limitations and found that those statements were not consistent with Plaintiff's other testimony and with objective medical evidence. (R. at 53). This sufficiently demonstrates that the ALJ considered precipitating factors in her decision.

Plaintiff also argues that the ALJ failed to consider the medication Plaintiff takes, simply stating, "Numerous medications including 3 Vicodin per day for many years with little relief." (Doc. 12 at 17). Further, Plaintiff argues the ALJ did not properly consider the other medical treatment Plaintiff receives, or other methods by which Plaintiff attempts to reduce pain, such as "[physical therapy], chiropractic, Depomedral injections, SI injections, facet joint and epidural injections, and a TENS unit," and "[i]ce, heat and many hours with feet elevated." (Doc. 12 at 17). The ALJ discussed the medication Plaintiff takes daily, as well as what Plaintiff uses at home for relief. (R. at 53). Further, the ALJ discussed the medical treatment Plaintiff received, such as the facet joint injections, epidural injections, and limited amount of chiropractic care. (R. at 53-55). There is no indication that the ALJ failed to consider these treatments in making her determination.

Finally, Plaintiff argues that the ALJ failed to properly consider Plaintiff's functional limitations, stating Plaintiff's medical condition is "complicated," and referencing, without citation to the specific pieces of evidence, the opinions of Dr.

Orteza, Dr. Garg, and Dr. Bailey. (Doc. 12 at 17). It is clear that the ALJ carefully considered Plaintiff's medical condition, and each of the doctors' opinions when making her decision. (R. at 52-56). In fact, much of the ALJ's decision rests on the inconsistencies evident in these doctors' opinions and in Plaintiff's own testimony, and arguing that the ALJ failed to consider these opinions is frivolous. (R. at 54-55).

Thus, the Court finds that the ALJ sufficiently considered the seven factors outlined in 20 C.F.R. § 404.1529(c)(3) and provided ample explanation for the reasons she found Plaintiff's testimony non-credible. The record does not show the ALJ's determination was patently wrong, and accordingly, the Court affirms the ALJ's credibility determination.

## CONCLUSION

For the foregoing reasons, the Court finds the ALJ's decision was supported by substantial evidence. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 15) is GRANTED. The decision of the Commissioner of Social Security is AFFIRMED pursuant to 42 U.S.C. § 405(g).

CASE TERMINATED.


Entered this 2nd day of July, 2013.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
